UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD ARMSTRONG, | No. C 06-6854 SI (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| BEN CURRY, warden, | |
| Respondent. | |

## INTRODUCTION

Howard Armstrong, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

In 1988, Armstrong was convicted in San Diego County Superior Court of second degree murder with an enhancement for use of a firearm in the offense. He was sentenced on July 26, 1988 to 17 years to life in prison. His habeas petition does not challenge his conviction but instead challenges a December 6, 2004 decision by the Board of Prison Terms, now known as the Board of Parole Hearings ("BPH") that had found him not suitable for parole. The 2004 hearing was Armstrong's fourth parole hearing, and was conducted at a time when he was more than 16 calendar years into his 17-to-life sentence.

The BPH identified the circumstances of the commitment offense as the primary reason for the determination that Armstrong was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Resp. Exh. D (reporter's transcript of December 6, 2004 BPH hearing (hereinafter "RT")) at 43-44. The BPH also relied, to a much lesser extent, on Armstrong's unstable social history (as evidenced by his use of drugs at a very early age and his selling of drugs at a very early age), and his inadequate parole plans with regard to employment. RT 44-45. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Armstrong sought relief in the California courts. The San Diego County Superior Court denied his habeas petition in a reasoned decision. Resp. Exh. F. The California Court of Appeal also denied his habeas petition in a reasoned decision. Resp. Exh. G. The California Supreme Court summarily denied his habeas petition. Resp. Exh. H.

Armstrong then filed his federal petition for a writ of habeas corpus. The court found cognizable a due process claim for insufficient evidence to support the BPH's decision. Respondent filed an answer and Armstrong filed a traverse. The matter is now ready for a decision.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed in a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.  Due Process Requires That Some Evidence Support a Parole Denial

A California prisoner with a sentence of a term of life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To

determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129. As a matter of state law, the decision must also satisfy the "some evidence" standard of review. See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous"); In re Rosenkrantz, 29 Cal. 4th 616, 676-77 (Cal. 2002).

      A critical issue in parole denial cases concerns the parole authority's use of evidence about the commitment offense that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).[1] Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate

---

[1] En banc review is now pending in a fourth case regarding the some evidence standard, Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008). The order granting en banc review states that the panel opinion is of no precedential value.

4

exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853.[2] Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

      The upshot of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not

---

[2]Interestingly, Irons was referring the actual number of years the inmate had been in prison and not the fictional number of years based on reductions for time credits. In Irons, the inmate had been in custody 16 years on his 17-to-life sentence, having been convicted in 1985 and challenging a 2001 parole decision.

5

currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a crime committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.[3]

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context. In addition to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of decisionmakers in predicting future behavior. Our system of federalism encourages this state experimentation." Id.; see also id. at 8.

Past criminal conduct is not some arbitrary factor like eye color that has nothing to do with present dangerousness. Recidivism concerns are genuine. See Ewing v. California, 538

---

[3] The California Supreme Court recently weighed in on the use of the commitment crime to deny parole in the companion cases of In re Lawrence, 44 Cal. 4th 1181 (Cal. 2008), and In re Shaputis, 44 Cal. 4th 1241 (Cal. 2008). The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." Lawrence, 44 Cal. 4th at 1191 (emphasis in source). Applying that rule, the court determined that there was not some evidence to deny parole in Lawrence but that there was some evidence to deny parole in Shaputis.

U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were arrested again within three years of their release). California's parole scheme does not offend due process by allowing the BPH to predict that an inmate presents a present danger based on a crime he committed many years ago.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

B.  State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal. 2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b). California law adds a layer of review by giving the Governor the power to review

7

the BPH decision and to affirm, modify or reverse the decision but only on the basis of the same factors the parole authority is required to consider. See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[4] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole. The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.

---

[4] The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety under the statute and corresponding regulations involves an assessment of an inmate's <u>current</u> dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[5]

C.  Some Evidence Supports The BPH's Decision

   1.  The BPH's Decision

The BPH identified the circumstances of the murder as the primary reason for its determination that Armstrong was not suitable for parole. The Life Prisoner Evaluation Report's summary of the murder was read into the record by a BPH commissioner:

> On October 24, 1986, Armstrong arrived at the victim's place of residence. Attached to the front door was a note that read, "if we don't get our money, we're going to kill you." Inside, (sic) the living room area with his revolver in his hand. Armstrong located the victim in another room, both went into the living room area. An argument ensued between the victim and Armstrong. As Armstrong attempted to leave the area, the victim jumped up, simultaneously Armstrong swiped at the victim using his right gun hand causing the revolver to fire one shot that struck the victim near the middle of the forehead. Armstrong ran out of the victim's residence leaving behind his car keys.

Resp. Exh. C, p. 1 (errors in source); RT 10-11. Armstrong declined to discuss the crime, but stated that he took "full responsibility for everything that happened in this case." RT 11. Armstrong was 31 when he committed this crime. He had no criminal history.

The BPH's decision stated that the murder "was carried out in an especially cruel and

---

[5]The California Supreme Court's determination in Lawrence that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988). However, Lawrence does not govern this court's analysis in every respect. This court is not bound by the discussion in Lawrence (see footnote 4, supra) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous. As to that point, Lawrence is persuasive authority, while the Ninth Circuit's holdings in Sass, Biggs, and Irons are binding authority. Also, Lawrence's determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

9

callous manner. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner that demonstrates an exceptionally callous disregard for another human being." RT 43. The motive for the killing was trivial, as it was "any time there's drugs involved." RT 43.

The BPH also noted that Armstrong had what could be considered an unstable social history. Armstrong began smoking marijuana at age 13 and sold drugs at school. He used marijuana and methamphetamine before his incarceration. RT 13; see also Resp. Exh. B, p. 11 (using methamphetamine, cocaine, and heroin; selling methamphetamine).

The BPH also had concerns about Armstrong's parole plans with respect to employment. He planned to live with his wife and planned to support himself as a dental technician, but did not have any job offer. The BPH noted that he had some letters of support in his file.

The BPH also considered other information about Armstrong. He had dropped out of high school in the 11th grade and joined the Navy. He stated he received an honorable discharge, RT 12, but one part of the record indicated he had received an honorable discharge after his first tour of duty and a general discharge after 3 years on his second 4-year tour of duty. Resp. Exh. B, p. 10. He apparently went through a drug rehabilitation program while in the Navy. Id. at 11. Armstrong stated that, while in the Navy, he received a GED. RT 14-15. He had worked as a dental technician both in the Navy and when he got out of the Navy. In prison, he had positive work evaluations. During his incarceration, he had not received any CDC-115 rule violation reports and had received only three CDC-128s, the last of which was in 1997. He had a favorable psychological evaluation. He had been involved with AA and NA and a 13-week Impact workshop.

2. State Court Decision

The California Court of Appeal's decision is the last reasoned decision from a state court. As the last reasoned decision, that is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). That court rejected Armstrong's challenge to the evidentiary sufficiency for the BPH's

1  decision and rejected Armstrong's contention that the BPH could not continue to deny him parole
2  based on the circumstances of his commitment offense. The court explained that the then-recent
3  decision of In re Dannenberg, 34 Cal.4th at 1095-96, allowed the BPH to "rely on the
4  circumstances of a commitment offense to deny parole when those circumstances are more than
5  the minimum necessary for conviction and the prisoner has not been held for a period grossly
6  disproportionate to his or her individual culpability." Resp. Exh. G, Cal. Ct. App. Opinion, p.
7  1. There was "some evidence the circumstances of Armstrong's commitment offense exceed
8  the minimum necessary for a conviction for second degree murder because Armstrong entered
9  the victim's residence with a loaded gun" and Armstrong had not been imprisoned for a period
10  grossly disproportionate to his culpability. Id. at 1-2.

### 3. Analysis Of Federal Claim

One unusual aspect of this case is that the current version of the crime that the BPH commissioner read into the record appears to be quite favorable to Armstrong. That version is inconsistent with the original appellate decision affirming the second degree murder conviction as well as information in the probation officer's report.

The California Court of Appeal stated in 1988:

> Armstrong, a drug dealer, shot one of his defaulting customers between the eyes at extremely close range. He claims the shooting was accidental and occurred when he attempted to strike the victim on the head, momentarily forgetting that he had entered the victim's residence with the gun in his hand, cocked to fire. Because our conclusion there is no instructional error eliminates any need to weigh the sufficiency of evidence to overcome any prejudice should an error have occurred, we do not go into further details as to the crime itself.
>
> Because the evidence in this case was such that the jurors could have found Armstrong lacked the requisite express or implied malice to make his crime murder had they believed his almost unbelievable scenario, the court instructed on the lesser included instruction (sic) of manslaughter.

Resp. Exh. E, Jan. 24, 1990 Cal Ct. App. Opinion, ¶. 2-3. The court then examined the implied malice instructions that had been given at trial, concluded that they were not deficient, and affirmed the second degree murder conviction. Although the state appellate court's opinion is difficult to understand without seeing the appellate briefs to put it in context, the opinion

11

suggests to this court that the properly-instructed jury did not believe Armstrong's story that the gun went off accidentally in the course of him swiping his hand at the victim's head. Yet that is basically the version of the crime the BPH recited.

Further information damaging to Armstrong exists in the probation officer's report prepared in 1988 that describes some evidence regarding the crime. See Resp. Exh. B. Witnesses stated that, on earlier occasions, the victim had been threatened by his drug dealer named George, that George had a lot of guns, and that George had pointed guns at the victim's head because the victim had not paid for drugs; another witness stated that Armstrong went by the nickname "George." Id. at 3.[6] When Armstrong was questioned by police, he initially denied having anything to do with the killing but, after his arrest, he changed his story and said the killing had been an accident. Id. at 4. The coroner determined that the "cause of death was a near-contact gunshot wound to the left forehead, one-half inch above the medial border of the left eyebrow and three-quarter inch to the left of the midline." Id. at 5. The victim's mother stated that Armstrong "had 'hounded' the victim for three months or more and had 'terrorized him.' She said that her son had used drugs, but had not gotten hooked until after he had met the defendant." Id. at 6; see also RT 23-24 (police department's letter in opposition to parole stating that Armstrong often sold crystal methamphetamine to the victim). In his own statement to the probation officer, Armstrong had explained that he had carried a gun at all times for the last two years due to being a drug dealer. Id. at 8.

In 2005, when the California Court of Appeal described the circumstances of the offense in the course of considering Armstrong's habeas petition challenging the denial of parole, the court recited what the BPH had described as the statement of the crime. "The circumstance as described by the Board were that Armstrong went to the victim's residence with a gun. There was a threatening note on the door. While Armstrong was in the apartment, the gun went off and

---

[6] The probation officer's report was favorable to Armstrong on one particular point: it suggested that Armstrong was not the source of the menacing note found on the victim's door. See Resp. Exh. B, p. 2 (explaining that three other men had put the note on the door allegedly as a joke because the victim owed small debts to them, and knew that victim had been threatened on earlier occasions by a man named "George" (which was Armstrong's nickname)).

12

the victim was killed." Resp. Exh. G, p. 1. The California appellate court stated that Armstrong's case involved circumstances more than the minimum necessary for a second degree murder in that he entered the victim's residence with a loaded gun.

This court sees the entry into a home with a loaded weapon as a slender reed on which to rest the determination that there were more than the minimum facts necessary to show a second degree murder. However, the record has information that is far more damaging to Armstrong, and is a record with ample support for the determination that the commitment offense alone shows that Armstrong's release would pose a danger to society or an unreasonable risk to public safety. The probation officer's report and the California Court of Appeal's 1990 decision provided some evidence that supported the determination that this crime was carried out in an especially cruel and callous manner. Although the current version read into the record was suggestive of an accidental discharge of a gun while Armstrong swiped his hand at the victim, there was evidence from which one could reasonably see this as a drug dealer shooting a defaulting customer point-blank in the face. This is supported by the combination of the second degree murder conviction, the information in the probation officer's report, and the 1990 California Court of Appeal opinion suggesting that the accidental gun discharge version of the shooting had been rejected.

Notwithstanding the positive factors for Armstrong, the BPH believed the criminal offense committed in 1986 that led to Armstrong's imprisonment was so bad that it still had enough weight to show that he posed an unreasonable risk of danger to society if released from prison in 2004. The BPH did not act arbitrarily or capriciously or without some evidentiary support in determining that the circumstances of the crime committed showed that Armstrong currently presented an unreasonable risk of danger to society if released, some 16 years into his 17-to-life sentence. The state appellate court's rejection of Armstrong's insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard. Armstrong is not entitled to the writ on this claim.

/ / /

/ / /

**CONCLUSION**

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 9, 2010

_____
SUSAN ILLSTON
United States District Judge